UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARK MUMA,

                            CIVIL ACTION NO. 15-12786

       *Plaintiff*,             MAGISTRATE JUDGE PATRICIA T. MORRIS

*v.*

COMMISSIONER OF SOCIAL SECURITY,

       *Defendant.*

_____/

## MAGISTRATE JUDGE'S OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 17, 19)

**I.**     **OPINION**

     **A. Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Doc. 4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 17, 19).

On March 2013, Plaintiff Mark Muma filed an application for DIB, alleging a disability onset date of September 15, 2012. (Tr. 62-63). The Commissioner denied his claim. (Tr. 62). Muma then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on April 3, 2014, before ALJ Andrew Sloss. (Tr. 30-53). At the

hearing, Muma—represented by his attorney, Paul Whiting—testified, alongside Vocational Expert ("VE") Pauline McEachin. (*Id.*). The ALJ's written decision, issued January 8, 2015, found Muma not disabled. (Tr. 33-52). On June 9, 2015, the Appeals Council denied review, (Tr. 1-6), and Muma filed for judicial review of that final decision on August 7, 2015. (Doc. 1).

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:   If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy

> that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Muma not disabled under the Act. (Tr. 8-25). At Step One, the ALJ found that Muma had not engaged in substantial gainful activity following his alleged onset date of September 15, 2012. (Tr. 13). At Step Two, the ALJ concluded that the following impairments qualified as severe: "degenerative disc disease and chronic obstructive pulmonary disorder." (*Id.*). The ALJ also decided that none of these met or medically equaled a listed impairment at Step Three. (Tr. 19-21). The ALJ then found that Muma had the residual functional capacity ("RFC") to perform light work with the following additional limitations:

> [O]nly frequently climbing ramps or stairs. He must avoid even moderate exposure to extreme cold and respiratory irritants, and must avoid concentrated exposure to extreme heat, wetness, or humidity.

(Tr. 19). At Step Four, the ALJ found Muma "capable of performing past relevant work as a manger and RV [recreational vehicle] technician as generally performed and his past relevant work as an IT [information technology] technician as generally and actually performed." (Tr. 24). In light of this finding, the ALJ did not proceed to Step Five, and deemed Muma not disabled. (Tr. 24-25).

### E. Administrative Record

#### 1. Medical Evidence

Muma worked a variety of jobs before his alleged onset date, including construction laborer, auto repair service manager, RV service technician, golf cart service technician, and tech support employee. (Tr. 188). Through the year 2013, Muma took a variety of medications to quell his symptoms, including: Advair (for breathing problems), Albuterol

5

(same), Clonazepam (for "leg problems"), Flexeril (for pain), Hyperlipidemia (for high cholesterol), Klonopin (for restless leg syndrome), Sertraline (for depression), Singular (for breathing problems), Ventolin (for COPD), Vicodin (for pain), Zocor (for high cholesterol), and Zoloft (for depression). (Tr. 157, 179).

In 2006, when his conditions began to emerge with more force, a chest MRI showed "some fatty end plate degenerative change involving the L2 vertebral body," "mild anterior wedging of T12," disc desiccation at L5-S1," "hypertrophic facet arthropathy and hypertrophy of ligamentum flavum throughout the lumbar spine" at L1-L2, L2-L3, L3-L4, and L4-L5, and "broad based disc bulge caus[ing] minimal ventral impression on the thecal sac" at T12-L1. (Tr. 287). The resulting impression of the cervical spine showed a "broad based disc/spur eccentric to the left at C5-C6, with moderate ventral impression on the thecal sac and effacement of the ventral CSF [cerebrospinal fluid]" as well as "increased T2 signal in the cervical spinal cord in this region suggesting edema or myelomalacia." (Tr. 288). Another MRI from September 2006 illustrates "some deformity of the [spinal] cord" and "mild discogenic and spondylitic change throughout the remainder of the thoracic spine," but "[n]o signal abnormality . . . within the cord" and "satisfactory alignment of the cervical spine." (Tr. 289). This left the impression of "[d]egenerative changes, most significant at T11-T12. . . . leading to canal stenosis and some deformity of the cord at this level." (*Id.*).

After these MRIs, Muma continued to work at his job. He also engaged—evidently, successfully—in physical therapy in the following years. A physical therapy report from May 2009 has Muma reporting "more than 50% improvement in his back condition,"

6

"improvement in strength and flexibility," and "independen[ce] in home exercises." (Tr. 279). His physical therapist, Sachin Desai, recorded that Muma described his pain as a "1/10" while also reporting "constant pain and difficulty in ADLs" and "back." (Tr. 272).

In his meetings with Dr. Ellsworth over the years, Muma's complaints frequently articulate back pain, leg pain, and difficulty breathing. In March 2013, for instance, he complained of "back [and] leg pain," seeking medication refills. (Tr. 214). A physical revealed "wheezing, but no respiratory distress" and "normal respiratory rhythm and effort." (Tr. 215). Dr. Ellsworth assessed fatigue and hyperlipidemia. (*Id.*). Earlier meetings with Dr. Ellsworth rang similarly, with physical examinations revealing at most some mild abnormalities. *E.g.* (Tr. 217) (July 2012: complaining of shoulder and neck pain; no finding of respiratory distress; "no CVA tenderness" although there was "restricted" flexion and extension); (Tr. 221) (June 2012: normal physical); (Tr. 223) (April 2012: complaining of "weak and aching of both legs and knees buck[ling]"; normal physical); (Tr. 227) (February 2012: normal physical); (Tr. 229) (January 2012: same); (Tr. 230-31) (November 2011: normal physical aside from some "[m]uscle pain and joint pain"). Likewise, later appointments reflect few or no abnormalities in his musculoskeletal functioning. *E.g.* (Tr. 311) (June 2013) (normal physical); (Tr. 307-08) (August 2013: complaining of back and lumbar pain "doing poorly" while COPD improved; normal physical); (Tr. 304-05) (September 1, 2013: complaining of foot pain following a concert two weeks before; normal physical); (Tr. 313) (September 16, 2013: chest MRI showing no abnormalities); (Tr. 330) (February 2014: normal physical and "gait intact"); (Tr. 326-27) (complaining of thigh pain; normal physical); (Tr. 341) (May 2014: normal physical);

(Tr. 323-24) (July 2014: complaining of "off and on" chest pain, as well as exacerbated leg and low back pain radiating down his legs; normal physical).

Objective findings from Dr. Ellsworth coincide with those from other medical sources who submitted opinions. In November 2011, Dr. Michael Frappier performed an MRI disclosing no problems with Muma's chest. (Tr. 236). In May 2013, Michael Dickson, a licensed psychologist, reported that Muma's gait "appears to be impaired," and that his emotional turmoil resulted from "frustrat[ion] by his situation." (Tr. 245-46). He then recorded the impression that Muma's "abilities to respond appropriately to co-workers and supervision and to adapt to change and stress in the workplace are mildly impaired." (Tr. 246). Similarly, Dr. Scott Lazzara found in the same month that Muma exhibited "no difficulty getting on and off the examination table, mild difficulty heel and toe walking, mild difficulty squatting, and mild difficulty standing on either foot." (Tr. 253). He also found "[s]traight leg raising . . . negative," "no paraverertebral muscle spasm," "cervical and lumbar spine straightening" and a somewhat limited range of motion in the cervical and dorsolumbar spine. (*Id.*). Later, in June 2013, Dr. Harold Nims recorded the following impressions: "COPD with mild to moderate exertion; the claimant is not short of breath during the exam"; "[c]hronic low back pain secondary to trauma"; "[c]hronic neck pain secondary to trauma"; and a "[h]istory of previous MI [myocardial infarction]." (Tr. 260).

In December 2014, Dr. Ellsworth submitted a letter suggesting that "Muma is virtually unemployable" because he "suffers from excruciating back pain. . . . has multiple bulging disks in his back, spinal stenosis and restless leg syndrome," which "cause[s] him to constantly shift positions . . . so he can relieve some of the pressure on his spine." (Tr.

8

345). In addition, Dr. Ellsworth notes that Muma "is easily distracted because of the unrelenting pain," and that he "also suffers from debilitating anxiety and is extremely claustrophobic." (*Id.*).

Dr. Ellsworth's letter seemed designed to supplement his August 2013 medical source statement, which found that Muma could occasionally lift and carry up to twenty pounds, but no more. (Tr. 265). Further, that Muma could sit for fifteen minutes at a time for a total of four hours in an eight hour workday; that he could stand for fifteen minutes at a time for a total of two hours, and could walk for ten minutes at a time for a total of one hour. (Tr. 266). For the remaining time, Muma "[m]ust lay down." (*Id.*). The reasons for these limitations were "herniated disc – lumbar radiculopathy." (*Id.*).

As to Muma's abilities, the statement indicated he could never reach over head, handle, finger, or push or pull, though he could occasionally reach (when not reaching overhead) and feel. (Tr. 267). He could never operate foot controls. (*Id.*). The reasoning read "herniated lumbar discs" and "radiculopathy." (*Id.*). In addition, Muma could never climb stairs, ramps, ladders, or scaffolds; nor could he balance, stoop, kneel, crouch, or crawl. (Tr. 268). The same reason was given. (*Id.*). Neither could Muma tolerate exposure to unprotected heights, moving mechanical parts, humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme cold or heat, or vibrations, though he could occasionally tolerate exposure to operating a motor vehicle. (Tr. 269). The same reason was given. (*Id.*). And lastly, Muma could not shop, walk on rough or uneven surfaces, use public transportation, climb steps at a reasonable pace with the use of a hand rail, or sort, handle, or use paper or files. (Tr. 270). Again, the same reason was given. (*Id.*).

9

### 2.   Application Reports and Administrative Hearing

#### a.       Function Report

Muma drafted a Function Report on April 9, 2013. (Tr. 161-70). In it, he indicated that he lives in a house with his fiancée, stepson, and daughter. (Tr. 163). Though he himself did not take care of pets, his fiancée, daughter, and stepson would "feed/water[,] bath[e] and groom the dogs." (Tr. 164). Generally, he described difficulties "stand[ing], sit[ting], [and] walk[ing] for long periods of time" because his "shortness of breach limits me badly." (Tr. 163). Indeed, shortness of breath—alongside aches and pains in his back, legs, and neck—was "constant" and prevented him from working or "being a productive employee." (*Id.*). This created problems "with any basic chore[,] i.e.: showering, getting productive sleep, getting dressed[,] etc." (*Id.*). During a typical day, he would "get out of bed, occasionally shower, read magazines, watch TV, eat dinner, shower, [and] go to bed. Very uneventful." (Tr. 164). He also described trouble sleeping because he would "wake up in the middle of the night 2/3 times every night gasping for air." (*Id.*). All of this seemed a marked departure from his prior, healthy lifestyle in which he would "walk/run/breathe, do normal activities that now I miss out on due to the fact I am in bad health." (*Id.*).

His condition affected his capacity to perform a variety of personal care activities as well: He dressed "slowly" because bending over made breathing difficult. (*Id.*). He suffered "panic attacks in the shower." (*Id.*). And though he would "occasionally" make a sandwich or "grill," his fiancée typically "prepare[d] all food," because his "lack of strength, breath," and inability to "keep attention to what's going on" interfered with such tasks. (Tr. 164-65). His fiancée would also "have to . . . remind[]" him "daily" of "what

[medication] to take." (Tr. 165). Ultimately, he "constantly" requires "help with all household duties" because his "condition will not allow me to perform any task." (165-66).

Muma's hobbies include "reading, [and] watching Nascar" and the "History [C]hannel." (Tr. 167). He did these activities "pretty much everyday," although "some days" he would "just sleep." (*Id.*). Social activities became frustrating because "[s]ometimes I'm irritable due to the fact I can't breath[e] and I miss out on a lot and cannot help out at home like I would like to"—as a result he did not "have any social life due to illness." (Tr. 168). "Occasionally," though, he did go out "for Sunday breakfast." (*Id.*).

Regarding Muma's exertional abilities, he indicated difficulty with the following: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, memory, completing tasks, concentration, understanding, and following instructions. (*Id.*). "Due to my condition[,] all the above checked are hard to perform and cause breathing issues along with different degrees of pain for me on a daily (hourly) basis." (*Id.*). He could walk fifty feet before stopping for five to ten minutes to rest. (*Id.*). To alleviate his symptoms, Muma would "always need something to lean on like a cane, wall, car[,] etc. almost daily to keep upright." (Tr. 169). In addition, he indicated difficulty concentrating and "remembering and focusing on what I'm trying to do." (*Id.*).

### b.   Muma's Testimony at the Administrative Hearing

At his hearing before ALJ Andrew Sloss, Muma confirmed that he had not worked since his alleged onset date of September 15, 2012. (Tr. 33). His prior work included serving as an RV technician who "serviced," "prepped," "cleaned," "repair[ed]," and performed "any kind of . . . maintenance or service" on RVs. (Tr. 33-34). He also worked

11

as a "rough framer," and performed "[t]echnical service[s]" for employers like General Motors and Chrysler. (Tr. 34-35).

Asked to describe the problems that keep him from working, Muma painted a vivid picture:

> Chronic pain, I have COPD, breathing is limited, can't walk very far, can't sit for long periods of time, constantly moving to get comfortable. I have to lay down, sit down, lay in a fetal position, whatever I can get relief from my bag. And then my breathing, I have an inhaler and I also take Advair and stuff for that and nebulizer. I take that several times a week. My doctor just advised me not to lift anything over 10, 15 – or 10 to 20 pounds. I can't bend, crouch, kneel because I have . . . the injuries to my back. . . . My neck, my cervical vertebra in my neck is herniated, damages my nerve. So my left side, my leg collapses at anytime it wants to. It's numb all the time. Left side hand is weaker than my right. What else? Just chronic pain and discomfort.

(Tr. 35-36). He said that his breathing troubles persist with and without exertion, but "if I exert myself, it's extremely worse" because "I also have asthma . . . . You know, like bending over to tie my shoes, that would just take my breath right away . . . ." (Tr. 36). Muma then admitted that he continued to smoke "[l]ess than a pack a day," though it "used to be over a pack a day. And I'm on Chantix for that also." (Tr. 37).

As for back pain, Muma said that "I got hurt in a fire" when working for the fire department, and a month after that incident "I got out of bed and fell flat on my face." (*Id.*). This incident also injured his shoulder, which, while painful, does not hurt "too bad." (Tr. 47). His doctor performed an MRI thereafter and "found out about the damage to my three discs." (Tr. 37). The doctor indicated that "two-thirds of my spinal cord is . . . collapsed." (*Id.*). Although surgery remained an option, Muma elected "exercises" like "back stretch[ing], leaning against the wall, . . . anything I can do to relieve the pain for moments

12

at a time. I've had electric shock to my back" and "heating pads applied." (Tr. 38). He also "did physical therapy for . . . 12 weeks," and daily "I just do whatever I can to relieve the pain. If I have to lay down for 10 minutes, I'll lay down. And then if it starts hurting, I'll get up and walk around or I'll sit down or stretch out, you know, just try to do whatever I can to make myself more comfortable." (*Id.*).

When asked about household activities, Muma recounted that "if I do dishes I do it and if I start getting tired or winded, I'll stop and take a break and then go back and finish it." (*Id.*). Likewise, he tried "to sweep the floor every now and then and help mop" but "for the most part, my girlfriend and her son take care of the heavy chores." (*Id.*). He tries to keep busy because "the less time I'm moving, the more time my muscles are going to tighten up." (*Id.*). His social life seems fairly dormant, as he does not "visit friends very often at all." (Tr. 39). If he goes shopping, "I'll get one of them drive around carts, which I really feel I'm too young to be in one of them, but the situation is what it is." (*Id.*). "I try to avoid doing anything walking like that, like concerts or anything like that. I don't participate in that stuff." (*Id.*). Instead, he spent his time "watch[ing] a lot of TV, try[ing] to read" though his "eyes just blur"—as a result, he "pretty much just sit[s] around the house . . . [and] take[s] care of my dogs, let them in and out of the house." (*Id.*). Frequently he finds himself "starting something at home and not being able to finish it." (Tr. 43).

He stopped working in 2012 when "I got fired for smoking within 20 feet of the building and then unemployment paid me off because they said that that was not a decent reason enough to let me go." (Tr. 40).

13

As to his difficulties sitting, Muma said he could likely "force myself to sit" in a normal straight-back chair "for an hour" but "I'm going to be in a lot more pain." (*Id.*). "I get nerve on my left side," and "cramps in my buttocks" as well as "getting numb" in his legs. (Tr. 41). These symptoms "might keep me out of work the next day" if forced to sit for extended periods over the course of an entire work day. (*Id.*). And though the distance he could walk at once "differs day to day," he placed the distance generally at "20 to 30 feet." (*Id.*). Though he frequently used a cane, he said, "I try not to walk with my cane like around the house or stuff if I don't have to. It's mainly to keep me from just like collapsing and falling down and I've done that frequently."  (Tr. 42). He could stand still for "five minutes or so and then my lower back just aches. The longer I stand, the worse it gets." (*Id.*). To stand up, he uses his cane "or a table that I can lean on or a wall that I can lean on, anything I can support myself on." (*Id.*). His pain does not usually "affect[] my focus so much, but if I start getting more pain and stuff, I feel nauseated and sick to my stomach," to the point that "I go gag, make myself actually gag and puke just to relieve my inflammation in my lungs."  (*Id.*).

Medication, though helpful, had side effects such as "[n]ervousness, anxiety. I have . . . panic attacks, like in the shower even." (Tr. 43). Residual pain would cause difficulty sleeping, such that "I pretty much sleep on the couch in an upright position when I have a hard time breathing. I'm constantly tossing and turning." (Tr. 44). He also naps "several times during the day" out of "boredom because . . . there's not much I can do that, you know, that keeps me busy without getting out of breath or being in pain. So, you know, a lot of it is out of boredom." (Tr. 44-45).

14

The ALJ then turned to Muma's comfort at the hearing. Muma relayed that "I've been in discomfort since I sat down here. . . . I'm constantly always moving or getting up and walking," a habit that a security guard commented on just before he entered the room. (Tr. 45). The pain was "always there. It's just how bad [it is] at the time." (Tr. 46). Difficulty using his arms and hands prevents him from lifting a "gallon of milk out of the refrigerator, I grab it with two hands now, . . . because I've dropped a couple of things. . . . So, yeah, I don't lift nothing too heavy or anything like that and if I do I use two hands." (*Id.*). He indicated that he did not think himself capable of "doing something repetitively with [his] hands." (*Id.*). Even switching between standing and sitting, due to the pain involved, would result in "missing work and that would just cost me a job." (Tr. 47).

Not all days are the same. "[B]ad days," when he "can't get out of bed," happen "probably two or three days" a month. (*Id.*). On such days "I wouldn't even drive . . . because I don't have full control of my legs all the time." (*Id.*).

Muma did not know exactly what caused his concentration issues, "unless it was maybe the pills that I was taking . . . or just the pain and stuff interfering." (Tr. 48). These issues became "just strenuous and too much work that I had to drop out" of the electrical engineering field. (*Id.*). "[I]f you've got to stand up, you can't be sitting down working on the computer and try to write and do what you need to do if you're standing up wandering around." (Tr. 49).

        **c.**     **The VE's Testimony at the Administrative Hearing**

The ALJ then called upon the services of a VE to determine Muma's ability to perform work. (Tr. 50). Commencing Step Four of his analysis, the ALJ leveled a hypothetical as follows:

> If you were to assume a person of the claimant's age and education and past work, is able to perform light work as defined by the regulations, except that he can frequently climb ramps or stairs and must avoid even moderate exposure to extreme cold and respiratory irritants and must avoid . . . concentrated exposure to extreme heat, wetness, or humidity. Could such a person perform any of the claimant's past work.

(*Id.*). The VE replied that such an individual could perform work as "a service manager[] [or] service technician job," though not as performed, and could also perform her "technical support" job "as performed." (*Id.*). However, if this individual's conditions prevented a full "40 hours" of competitive employment, such conditions would be work preclusive. (Tr. 51). When prompted by a question from Muma's attorney, the VE indicated that a person whose conditions required her to sit "four hours and stand[] and walk[] a total of two hours" would not be eligible for competitive employment either. (Tr. 52). The VE then clarified that "for simple, unskilled work, an individual cannot be off task more than 20 percent of the workday." (*Id.*).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or

certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

17

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting

objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*,

749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

> (i)    [D]aily activities;
> (ii)   The location, duration, frequency, and intensity of . . . pain;
> (iii)  Precipitating and aggravating factors;
> (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
> (v)    Treatment, other than medication, . . . received for relief of . . . pain;
> (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

20

A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G. Analysis

Muma puts forth two arguments in his motion for summary judgment: (1) The ALJ erred in assigning only partial weight to his treating physician's opinion, while assigning great weight to several non-treating physicians and consultative examiners ("CEs"). (2) And the ALJ performed an improper credibility determination. I address each argument in turn.

### 1. The ALJ Properly Evaluated and Weighed the Medical Evidence

According to Muma, the ALJ should have assigned greater weight, if not controlling weight, to the opinion of his treating physician, Dr. Ellsworth. First, he notes that the ALJ's decision "is entirely devoid of any mention" of Dr. Ellsworth's December 17, 2014 statement that in his "professional opinion," Muma "is virtually unemployable." (Doc. 17 at 5) (Tr. 355). This, he posits, "requires a remand on its own." (*Id.* at 6). Second, Muma contends that the ALJ "failed to explain how the treating source's opinion was not consistent with the clinical or diagnostic presentations of the medical records" and "failed to point out which records or evidence he was referring to." (*Id.* at 18). Third, Muma suggests that the ALJ mischaracterized Dr. Ellsworth's medical source statement as limiting Muma to a "limited range of light work," when in fact the statement limited Muma to "occasional lifting/carrying of 10 pounds, which is below the standard for light work."

(*Id.* at 6-7) (Tr. 24). Taken together, Muma argues such defects undermine the ultimate purpose of granting "treating doctors . . . more weight than an ALJ's opinion or a one-time examiner's opinion." (*Id.* at 3).

Where an opinion from a treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" in a case record, the ALJ must give it "controlling weight." 20 C.F.R. § 404. 1527(c)(2). If the opinion is not given controlling weight, the ALJ must engage in the six-factor balancing test described in § 404.1527(c)(2)-(6). In *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994), the Sixth Circuit explained the rationale behind this rule: "[A] medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." Ideally, a treating physician who has seen the claimant "a number of times and long enough to have obtained a longitudinal picture" of a claimant's impairment may bring "a unique perspective to the medical evidence" as a whole. 20 C.F.R. § 404.1527(c)(2)-(2)(i).

Dr. Ellsworth's medical source statement falls far short of this ideal. As the ALJ noted, "the record reveals that actual treatment visits have been relatively infrequent and routine in nature. The course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were totally disabled." (Tr. 24); *see, e.g.*, (Tr. 214) (routine checkup); (Tr. 226) (routine checkup and refills); (Tr. 228) (refills); (Tr. 230) (routine checkup and refills). The medical source statement Dr. Ellsworth filled and signed

22

simply checks the most severe boxes available and inserts the words "herniated lumbar discs" and "peripheral neuropathy" or "radiculopathy" a grand total of seven times as an all-encompassing explanation. (Tr. 265-70). As the ALJ recognizes, these evaluations hardly serve to demonstrate that Dr. Ellsworth's treating relationship brings a unique perspective to the evidence, nor that Dr. Ellsworth's opinion conveys a longitudinal picture of Muma's conditions. (Tr. 24). "Though brief," the ALJ's reasoning proves sufficient. *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009).

As to the other medical sources, Muma claims that the ALJ attributed to them great weight with "no other explanation, other than the boilerplate language, for why the non-treating records were afforded more weight than the treating sources." (Doc. 17 at 8). This was particularly improper, he suggests, because "none of the non-treating sources were able to review Dr. Ellsworth's medical source statements or updated records meaning their opinions were all based on incomplete information and a single quick one-time examination (or not even an examination) and are therefore unreliable." (*Id.* at 9). In addition, he contends that the ALJ "did not provide justification or reasoning for how or why he considered non-treating reports to be consistent with the evidence of the record as a whole" when they "are clearly not consistent with [] Muma's testimony or the treating doctor medical records." (*Id.* at 13-14).

Although the ALJ "generally should explain the weight given to opinions from . . . 'other sources,'" there remains "a distinction between what an adjudicator must consider and what the adjudicator must explain." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). "[T]he SSA requires ALJs to give reasons for only *treating* sources." *Smith*

23

*v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007); *accord Homrich v. Colvin*, 2013 WL 5354229, at *8 (W.D. Mich. Sept. 24, 2013); *cf. DePottey v. Comm'r of Soc. Sec.*, 2014 WL 4197362, at *12 (E.D. Mich. Aug. 22, 2014) ("[T]he ALJ may give her reasons in an 'indirect but clear' or 'implicit[]' manner." (quoting *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010))). "There is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record." *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir. 2011).

Muma highlights several paragraphs in the ALJ's opinion according great weight to Dr. Dickson, Dr. Lazzarra, a state agency reviewing psychologist, a state agency medical reviewer, and a consulting medical examiner without much attendant explanation. (Tr. 23-24). But it ignores his more extensive illustration of the medical evidence earlier in the opinion. (Tr. 13-19). Although an ALJ may not include in her analysis "only those portions of the [record] which cast [the claimant] in a capable light and exclude[] those portions which show[ the claimant] in a less-than-capable light," the ALJ's opinion in this case certainly betrays no such error. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002). Indeed, his suggestion that these opinions were consistent with the record as a whole plainly includes in its calculation results from Dr. Ellsworth's examinations, as well as Muma's own assertions. *E.g.*, (Tr. 18) (describing a February 12, 2014 physical exam performed by Dr. Ellsworth as "well within normal limits"); (Tr. 17) (same as to a September 3, 2013 checkup); (Tr. 15) ("The claimant again reported he had lost his job in September 2012 because of smoking on the job."). Muma's contention that "treating doctors and medical providers should be afforded more weight than . . . a one-time

examiner's opinion," (Doc. 17 at 3), simply does not apply in this case. *See Smolar v. SPX Corp. Short & Long-Term Disability Plans*, 2013 WL 3944440, at 8 (E.D. Mich. July 31, 2013) ("[T]he United States Supreme Court [has] rejected the proposition that the opinions of treating physicians are inherently more reliable than those of non-treating physicians.").

### 2.   The ALJ Did Not Make an Improper Credibility Determination

Muma also takes issue with the ALJ's credibility determination. He suggests that the "inconsistent information provided by [] Muma were not actual inconsistencies, but a twisting of his testimony to support [the ALJ's] decision." (Doc. 17 at 13). "As with the medical evidence, ALJ Sloss cherry picked bits and pieces of evidence, out of context, to support his denial as opposed to properly considering all the evidence as a whole." (*Id.*). And as a result of the ALJ's "blanket statements" discounting Muma's credibility, "the Court will find that it cannot trace the path of the ALJ's reasoning." (*Id.* At 16-17).

Unfortunately for Muma, the ALJ's analysis flows as it should under 96-7p. The ALJ notes that objective medical evidence does not substantiate Muma's statements as to his symptoms' severity. (Tr. 21). Where an ALJ finds such a void, 96-7p requires her to "make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). To this end, the ALJ provided myriad reasons as to why Muma's statements "may not be entirely reliable," (Tr. 23): Muma "worked for many years with [his] conditions." (Tr. 21-22). Muma claimed to have stopped working "due to his conditions" when he actually "was fired from his job for smoking on the job." (Tr. 22). Muma's conditions "reached 50%

25

improvement regarding his back in spite of missing several sessions and was discharged to continue with a home program." (*Id.*). Dr. Ellsworth's objective test results in November 2011 and March 2013 did not correspond to the severity of Muma's complaints. (*Id.*). Muma proclaimed his need for a cane in April 2013, yet appeared at a May 2013 consultative examination "without difficulty and without the use of a cane or other assisted device." (*Id.*). Muma stated "he did not attend concerts," but a medical record documents how "his foot an [sic] ankle began to swell" while "attending a concert." (Tr. 20, 39, 304). Muma "was supported by unemployment at the time of this examination." (Tr. 22). Muma's reported inability to do any activity requiring "physical exertion, including cooking or household chores" in April 2013 conflicted markedly with his testimony at the April 2014 hearing that "he helped with the housework as much as he could, fixed meals, and was independent in his self-care needs." (*Id.*). And Muma "sat through the 40-minute hearing with no evidence of discomfort." (Tr. 23).

Self-evidently, the ALJ's reasoning addresses issues regarding the consistency of Muma's testimony and the objective medical record's inability to substantiate it, the degree and success of Muma's treatment over the years, the inherent inconsistency of Muma's unemployment and disability applications, and his personal observations regarding Muma's demeanor and stature at the hearing. *See* 96-7p, 1996 WL 374186, at *5-*8 (SSA July 2, 1996); *see also Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801-02 (6th Cir. 2004) ("There is 'no reasonable explanation for how a person can claim disability benefits under the guise of being unable to work, and yet file an application for unemployment benefits claimant that [he] is ready and willing to work.'" (citation

26

omitted)). The ALJ drew from substantial evidence to arrive at his credibility analysis, and the Court can easily trace the path of his reasoning.

Seeking to rebut this conclusion, Muma cites several examples of the ALJ allegedly mischaracterizing or cherry-picking the record. None warrant remand:

First, Muma suggests that the ALJ "minimized" evidence and testimony showing "that his impairments have gotten more severe, as would be expected from a degenerative disease," and that his "attempts to remain employed should weigh in favor of his credibility." (Doc. 17 at 14). That Muma was diagnosed with a degenerative disease says nothing about the severity of its symptoms. *Cf. Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 805 (6th Cir. 2008) ("[A] *diagnosis* . . . does not automatically entitle Vance to disability benefits; particularly so here, where there is substantial evidence to support the ALJ's determination that [the condition] was either improving or, at worst, stable." (emphasis added)); *Richer v. Comm'r of Soc. Sec. Admin.*, 2012 WL 2130970 (N.D. Ohio June 12, 2012) (upholding a denial of benefits because scoliosis and degenerative disc disease were "stable" with "pain modestly controlled with minimal activity"). The ALJ did not "minimize" evidence of severity, nor did he fail to explain what evidence he relied on to arrive at his conclusions, (Doc. 17 at 14-15)—rather, he relied on substantial evidence from other medical sources evincing impairments severe enough to preclude heavy and moderate exertion, but not light work. (Tr. 23-24).

Further, Muma suggests that although "doctors have ordered additional MRI's [sic] due to increased symptoms, . . . his documented claustrophobia has prevented any further MRI's [sic] so far." (Doc. 17 at 14). Strangely, Muma cites not to any testimony that his

medical impairments kept him from such testing—for there is no such testimony—but rather to a page-long letter in which Dr. Ellsworth says (without accompanying explanation) that Muma "is extremely claustrophobic." (*Id.*); (Tr. 345). Such evidence alone neither proves that Muma in fact suffers from extreme claustrophobia, nor does it support his post-hoc argument as to why he never followed his doctor's advice. *See Harris v. Comm'r of Soc. Sec.*, No. 14-cv-14508, 2015 WL 7307972, at *4 (E.D. Mich. Nov. 20, 2015) ("[B]ecause Harris did not present evidence that her mental impairments actually prevented her from seeking counseling, the ALJ did not err when he determined that her failure to seek counseling weighed against a finding that she was disabled.").

Second, Muma contends that the ALJ "mischaracterized the evidence and testimony regarding [his] daily activities." (Doc. 17 at 15). He claims that his testimony, "consistent with the rest of the evidence," shows "he did what housework he could but needed breaks," and that "[m]ost of the rest of his time was spent resting, which is consistent with the treating medical records and [medical source statement]." (*Id.*). In fact, Muma's statements respecting his capacity to undertake miscellaneous tasks vary considerably. In his function report, he answered the question, "If you don't do house or yard work, explain why not," with, "My condition will not allow me to perform any task," (Tr. 166)—but in his testimony, he indicated that he "[t]r[ies] to sweep the floor every now and then and help mop out. . . . I try to do as much as I can just so I do stay mobile because the less time I'm moving, the more time my muscles are going to tighten up," (Tr. 38). Even discounting these incongruities, Muma's isolated accounts of his abilities clash sharply with objective medical evidence, which attributes to him a more robust constitution. (Tr. 215, 218, 221,

224, 227, 229, 231) (Dr. Ellsworth: Reporting normal respiratory and coronary function);
(Tr. 245) (Dr. Dickson: "He states that he is able to do basic food preparation. Mark says
he is independent in self-care and personal hygiene."); (Tr. 256) (Dr. Lazzara: "He did not
appear overtly dyspneic. He did not appear hypoxic . . . . I do not find any active radicular
symptoms in his upper extremities. At this point . . . avoidance of *heavy* repetitive work
would be indicated." (emphasis added)); (Tr. 260) (Dr. Nims: "There is no chest tenderness
to palpation. The claimant was not noted to be short of breath with exertion or when lying
flat during the exam.").

Third, Muma sees no reason why the fact that he "testified that he needed to lie
down several hours on a daily basis, but never reported that to his physicians" should harm
his credibility. (Doc. 17 at 15). According to Muma, "a person does not report everything
to his physician," and the fact that Dr. Ellsworth's statement nevertheless reflects such a
limitation should vouch for the veracity of Muma's claims. (*Id.*). An ALJ may, however,
draw negative inferences regarding a claimant's credibility when her testimony discloses
glaring limitations that escape her physician's treatment notes entirely. *E.g.*, *Jones v.
Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("The ALJ explained in his written
order that he found it likely that Ms. Jones, had she been telling the truth about having left
so many jobs as a result of crying spells and panic attacks, would have discussed such
events with [her counselor] Berrisford, in whose reports such events were notably
lacking."); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) ("Cline himself
admitted that he never told his treating physicians anything was wrong with his colostomy.
As a result, there was ample reason or rejecting Cline's allegation that he needed three to

four hours to irrigate his colostomy in any given 8-hour period."); *accord Richmond v. Shalala*, 23 F.3d 1441, 1443 (8th Cir. 1994) ("The ALJ noted . . . that although Richmond complained of side effects at the hearing, there was no medical evidence that Richmond had complained to doctors about the significant side effects."); *cf. Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 543 (6th Cir. 2007) ("As noted by the ALJ, Cruse claimed that she could not walk without her walker despite the fact that she had told Dr. Curwen that she did not always need the walker and hoped to be free of it within weeks."); *Rogers v. Barnhart*, 446 F.Supp.2d 828, 853 (N.D. Ill. Aug. 1, 2006) (discounting the opinion of a physician whose "own progress notes" did not "reflect complaints that the plaintiff had [the alleged] limitations"). One would typically expect a patient to inform her physician that she spends large portions of each day bedridden. The ALJ was permitted to find this omission impeaching.

Fourth, because "he did not get his cane until July 9, 2013," Muma posits that his appearing for a May 2013 consultative exam without a cane perfectly illustrates "a worsening of his condition" consistent with his statements. (Doc. 17 at 15-16). The Court might sympathize with this gripe if Muma had not conspicuously omitted from his brief an April 2013 statement that he often needed a cane—made at a time when, by his own admission, *he did not own a cane*. (Tr. 169). That the ALJ spotted this discrepancy bolsters his credibility finding. (Tr. 22).

Fifth, Muma notes his statements during the hearing that he was uncomfortable in an effort to rebut the ALJ's personal observations that he did not appear uncomfortable. (Doc. 17 at 12). ALJ's are encouraged to take their personal observations into consideration

30

when possible. *See* SSR 96-7p, 1996 WL 374186, at *8 (July 2, 1996) ("[T]he adjudicator is not free to accept or reject the individual's complaints *solely* on the basis of . . . personal observations, but *should consider* any personal observations in the overall evaluation of the credibility of the individual's statements." (emphasis added)). This Court owes "special deference" to the ALJ's credibility determination when she has an opportunity "to observe the demeanor of the claimant." *Crawford v. Sec'y of Health & Human Servs.*, No. 92-6024, 1993 WL 205923, at *3 (6th Cir. 1993); *accord Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 846 (6th Cir. 2005) ("We recognize this is a close case . . . but because substantial evidence exists to support his findings, we must defer to the ALJ's fact-finding role and his determination of the claimant's credibility, as he has personally observed the claimant at the hearing."). In addition, the ALJ's observations also directly contradict Dr. Ellsworth's statement that Muma's "conditions cause him to *constantly shift positions* from sitting to standing and/or l[ying] down in no certain order so he can relieve some of the pressure on his spine." (Tr. 345). For these reasons, Muma's statements do not oblige this Court to correct the ALJ's findings.

### 3.  The ALJ's RFC Accurately Depicts Muma's Condition

Aggregating his objections, Muma contends that as a result of allegedly improper balancing, the ALJ "fail[ed] to include all of [] Muma's impairments and restrictions in the RFC." (Doc. 17 at 13). Because the "substantial weight of the evidence shows that the RFC was significantly lacking," the VE's testimony "was not sufficient to deny [] Muma's claim." (*Id.*). As discussed at length, *supra*, substantial evidence undergirds the ALJ's findings. That he did not subscribe to Dr. Ellsworth's opinions or Muma's statements does

31

not delineate error in his analysis. Likewise, he was free to omit Muma's unsubstantiated limitations from his questions to the VE. *Accord Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010) ("[I]n formulating a hypothetical question, an ALJ is only required to incorporate those limitations which he has deemed credible.").

### H. Conclusion

For the reasons stated above, the Court finds that the ALJ's decision, which ultimately became the final decision of the Commissioner, is supported by substantial evidence.

## II.   ORDER

In light of the above findings, **IT IS ORDERED** that Muma's motion for summary judgment (Doc. 17) is **DENIED**, and the Commissioner's motion for summary judgment (Doc. 19) is **GRANTED**.

Date:  October 19, 2016                        S/ PATRICIA T. MORRIS
                                               Patricia T. Morris
                                               United States Magistrate Judge

### CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: October 19, 2016                        By s/Kristen Castaneda
                                              Case Manager